## LIDGERWOOD MFG. CO. v. LAMBERT HOISTING ENGINE CO.

(Circuit Court, D. New Jersey. January 30, 1907.)

1. PATENTS—INFRINGEMENT—CABLE CONVEYORS.

The North patent, No. 480,029, for a conveying apparatus, relating to cable conveyors, and the essential feature of which is a self-propelling and self-distributing fall-rope carrier, was not anticipated and discloses invention. Also *held* infringed.

2. SAME—INVENTION.

The Dusedau patent, No. 548,973, for a cable-hoist, is void for lack of invention.

3. SAME—INFRINGEMENT—EQUIVALENT PARTS.

Two wheels or pulleys connected together so as to revolve as one by bolts or other close fastenings, and a single wheel cast with two peripheral contacts, are mechanical equivalents, where they operate in the same manner to produce the same result, and the substitution of one for the other in a patented device does not avoid infringement.

In Equity. On final hearing.

Gifford and Bull (Livingston Gifford, of counsel), for complainant.
Edward M. Colie (William Houston Kenyon, of counsel), for defendant.

CROSS, District Judge. This matter is before the court upon final hearing on bill, answer, replication, and proofs, and involves the validity of two patents and their infringement by the defendant. The first patent in suit, No. 480,029, for a conveying apparatus, was issued August 2, 1892, to Charles M. North, assignor to the complainant, and the second, No. 548,973, for a cable-hoist, was issued October 29, 1895, to one Wilhelm Dusedau, and assigned to the complainant June 6, 1902.

Claims 1, 6, 7, 8, 9, and 10 of the patent No. 480,029 are involved, and are as follows:

"(1) In a conveying apparatus, in combination, a cable or trackway, a load-carriage, a rope traveling therewith, and a rope-carrier containing a wheel adapted to be turned by said traveling rope, a wheel adapted to bear against the cable, or trackway, and connections between said two wheels, whereby the rotation of the first is communicated to the second, substantially as described."

"(6) In a conveying apparatus, in combination, a cable or trackway, a load-carriage, a rope extending to said load-carriage and running approximately parallel with the cable or trackway, and a rope-carrier mounting the following parts, viz.; a traction device adapted to travel on the cable or trackway and mechanism actuated by said rope, whereby the movement of said traction device, and thereby that of the carrier, is controlled, substantially as described.

"(7) In a conveying apparatus, in combination, a cable or trackway, a load-carriage, a rope extending to said carriage and running approximately parallel with the cable or trackway, and a series of rope-carriers, each of which mounts the following parts, viz.; a traction device adapted to travel on the cable or trackway and mechanism actuated by said traveling rope, whereby the movement of said traction device, and thereby that of the carrier, is controlled, substantially as described.

"(8) In a conveying apparatus containing a cable or trackway, a carriage, a rope extending to said carriage and running approximately parallel with the cable or trackway, a rope-carrier, a device mounted on said carrier, adapted to travel on the cable or trackway, and a device mounted on said carrier, adapted to engage with said rope, the combination, with said devices, of connections whereby the motions of one of said devices are communicated to the other, substantially as described.

"(9) In a conveying apparatus containing a cable or trackway, a carriage, a rope extending to said carriage and running approximately parallel with the cable or trackway, a series of rope-carriers, a device mounted on each of said carriers, adapted to travel on the cable or trackway, and a device mounted on each of said carriers, adapted to engage with said rope, the combination, with said devices on each carrier, of connections whereby the motions of one are transmitted to the other, the speed of said transmission being in decreasing series from the carriage toward the end of the cable or trackway, substantially as described.

"(10) In a conveying apparatus, in combination, a load-carriage, a cable or trackway, a member connected with the carriage and extending along the cable or trackway, a rope-carrier, mechanism mounted thereon engaging with and driven by said member, propelling mechanism, also mounted upon said carrier, and means whereby the movement of the mechanism driven by said member is communicated at a reduced speed to said propelling mechanism, substantially as described."

Both of these patents in suit have to do with the use of a cableway, which consists in general of a cable stretched between the tops of two towers or supports, over which cable a load is conveyed from point

to point, suspended from a load-carriage, which is supported from the cable by wheels running freely thereon. There is also a haul-rope fastened to opposite sides of the load-carriage and running to each tower, whereby the carriage is hauled back and forth along the cable. What is called a "fall-rope" holds the load in suspension from the load-carriage, and extends from it along the cable to the tower at which the engine is located, called the "head-tower," and thence to the engine. By hauling in or paying out this 'fall-rope, the engine can raise or lower the load at any point along the cable to which the load-carriage may be run. It is obvious from what has been said that so long as there is a load attached to the end of the fall-rope that rope will be taut, and it is equally obvious that, when the load is released from the fall-rope, it will, because its body is heavier than its unloaded end, slacken and sag between the load-carrier and the tower, and that, while in this condition, the unloaded end of the fall-rope could not again be lowered to take on a new load. For a long time prior to the issue of the North patent it had been a problem how to prevent the fall-rope from sagging or bellying when the load was released, and, to obviate or lessen the difficulty, rope-carriers, as they are called, of various kinds had been invented to sustain the fall-rope at all times, whether loaded or unloaded, on a level, and as nearly parallel as might be, with the cable. To accomplish this successfully, it was necessary that the rope-carriers should move in succession from the tower after the load-carriage, and severally arrange themselves in a proper position to support the fall-rope, no matter where the position of the load-carriage might be. Several patents were issued covering different devices intended to accomplish the desired end, and a number of them have been cited by the defendant as anticipations of North's invention, but they seem to me to be so far removed from what North accomplished as not to require special or detailed consideration. North was the first to employ a self-regulating fall-rope carrier. "Heretofore it has been customary," adopting the language of his specification, "in apparatus, employing a load supporting carriage traveling on a cable and also employing traveling rope-carriers, to regulate the travel of the rope-carriers either by flexible connections between them or by stops located along their path of travel and cause them to follow the carriage in its outward movement either by an attachment between them and the carriage, or by their own gravity. My invention has for its object to provide new means whereby the travel of the rope-carriers is actuated and regulated, and it consists of driven mechanism whereby the carrier is caused to progress along the cable or trackway, * * * this fall-rope or endless rope, as the case may be, acts as a motor to drive the mechanism located upon each of the carriers, and engaging with the cable and thereby causes each carrier to follow the carriage, though with less speed. The speed at which each carrier advances will be regulated by the diameter of the wheels or gears interposed between the sheave receiving motion from the fall-rope, or the endless rope and the sheave bearing against the cable, so that in the series of rope-carriers on each side of the carriage, each one of the series will travel faster than those farther away from the carriage. By this means each

series of rope-carriers will space itself along the cable at proper distances apart for all positions of the carriage."

And at the close of his specifications he makes this broad statement, or claim:

"I believe that I am the first one to actuate the travel of the rope-carrier, by positively driven mechanism of any kind located upon the carrier."

I think his claim was well founded. The prior art does not disclose that ever before had either the fall-rope or the endless haul-rope acted as a motor of its own rope-carrier, nor had the rope-carrier itself contained any kind of travel regulating mechanism, for either the fall-rope or the endless haul-rope, to act as a motor upon. As one of the witnesses said:

"Mr. North's invention was the first self-propelling fall-rope carrier. It was the first self-distributing fall-rope carrier. It required no additional ropes or chains. It employed only the ropes that would be required to operate a cableway, were there no fall-rope carriers at all."

This statement seems to me to set forth briefly, but clearly, the real character of his invention. The North system was in a sense automatic, and that could not have been said of any of the prior devices. Some of the earlier patents had the rope-carriers run out from the head-tower by gravity, and spaced by flexible connections between them. In others they were hauled out by the load-carriage and spaced as just stated, or by being dropped by the load-carriage at determined intervals; or they were stationary, and were deflected to permit the passage of the load-carrier; or, again, they were spaced by stops or buttons, and of this character were those more generally in use in the United States at the date of the North patent. In no one of these systems, however, can I discover anything which suggested, much less accomplished, what North did. Indeed, the defendant's expert inferentially admitted this by basing his claim of anticipation largely upon the Atkins patent, an English patent issued in 1888, for "a new or improved machine or apparatus for establishing communication between distant points (such as mounting overhead wires over streets, rivers and other places), by means of existing wires or the like." The title of the patent discloses the use for which the device was intended. The art in which it is found is not analogous to that with which we are dealing. It is, moreover, a load-carriage. It does not disclose a rope-carrier in the sense in which the word is used in the art in which the North patent is found. It has but one carrier of any kind. Atkins' idea was to make a self-propelling load-carriage. His device was not intended for any other purpose, and, if it were duplicated or triplicated, there would still be no self-propelling self-distributing rope-carriers or series of rope-carriers such as North devised. The Atkins patent does not disclose any fall-rope or haul-rope as used in this art. All of the claims of the North patent which are in issue require two vehicles, a load-carriage and a rope-carrier, but this does not at all feaze the defendant's expert, who says that, "if a constructor desired to use both a load-carriage and a rope-carriage or carrier, he would simply duplicate that apparatus [Atkins']." This is not so. The functions of the vehicles are distinct. The function of the rope-carrier is to support and

keep from sagging the body of the traveling rope (by whatever name called), which propels the load-carriage, and in so doing it passes freely through and beyond the rope-carrier, while the function of the load-carrier is, of course, to carry the load, and the haul-rope, or fall-rope, as the case may be, is attached to the load-carrier, and does not pass freely through and beyond it. The North patent, moreover, disclosed a true combination between the traveling rope, the load-carriage, and the rope-carrier. The traveling-rope actuates the load-carriage and the load suspended therefrom, while the body of the rope itself is, in turn, supported by the rope-carrier between the tower and the load-carriage. These actions are mutual and dependent, and, since Atkins discloses but one carrier, it is plain that his device cannot disclose any such mutual or dependent action or any such combination as North discloses. The difference between that patent and North's is well summed up by the complainant's expert in the following language:

"It seems obvious that this device is radically different from that of patents in suit, and, if operative at all, has a very different utility from that of the ordinary cableway conveyor. If the traveler of the Atkins patent can be likened to any part of the apparatus of the patents in suit, it is certainly to the load-carriage and not to the fall-rope carrier. The obviously intended function or peculiarity of the device is its capability of operation to or from a fixed point, without any propelling means extended to the opposite end of its path of travel. In the apparatus of sheet 1 of the drawing, the traveler can move in one direction only, namely, away from the point of attachment of the propelling rope. It is a device which, when pulled towards one, recedes instead of approaching, and it was clearly this problem, and this problem only, with which the patentee was dealing. The system of the Atkins patent contains no rope-carriers nor any part of analogous function or purpose in the structure, and it therefore cannot have any of the combinations in issue."

The purpose and function of the Atkins device are so unlike that of the North patent, and so foreign to the art in which it is found, that it would have been more likely to becloud than clarify the mind of one seeking to invent a system of self-distributing rope-carriers. I think that patent No. 480,029 as to the claims relied upon is valid.

Turning now to the second patent in suit, that of Dusedau, No. 548,973, we find that claims 1, 2, 4, 11, 12, 13, 14, and 15 are involved. They are as follows:

"(1) In a cable-hoist, the combination with a carrying cable; of a carrier mounted thereon, and provided with traversing gear; and a rope to impart motion to said gear and thereby cause the carrier to travel along the cable; said rope being connected with said gear beneath the cable.

"(2) In a cable-hoist, the combination with a carrying cable; of a carrier mounted thereon, and provided with traversing gear; and a hauling-rope to impart motion to said gear, and thereby cause the carrier to travel along the cable; said rope being connected with said gear beneath the cable."

"(4) In a cable-hoist, the combination with a carrying cable; of a carrier mounted thereon, and provided with a supporting wheel or sheave to run on the cable; and a hauling-rope arranged below the cable to impart motion to the sheave."

"(11) In a cable-hoist, the combination with a carrying cable; of a series of carriers mounted thereon, and a rope operatively connected with said carriers beneath the cable to move said carriers simultaneously upon the cable.

"(12) In a cable-hoist, the combination with a carrying cable; of a series of carriers mounted thereon; and a rope operatively connected with said carriers beneath the cable whereby said carriers are caused to travel simultaneously but at different speeds.

"(13) In a cable-hoist, the combination with a carrying cable; of a series of carriers mounted thereon; and a hauling-rope operatively connected with carriers beneath the cable, and adapted to move all of said carriers simultaneously.

"(14) In a cable-hoist, the combination with a carrying cable; of a series of carriers mounted thereon; a hauling-rope operatively connected with the carriers beneath the cable, and adapted to move all of said carriers simultaneously but at different speeds.

"(15) In a cable-hoist, the combination with a carrying cable; of a series of carriers mounted thereon and each carrier having traversing gear corresponding to the position it is to occupy on the cable; and a rope beneath the cable for actuating said carriers, whereby they will distribute themselves automatically at the desired points."

Dusedau recognizes the North patent, but claims an improvement thereon, which consists in having the rope-carriers propelled by what in some of the claims is called a "rope" and in others a "hauling-rope" arranged "below the cable" or "beneath the cable." Whatever of novelty this patent has must lie in arranging the propelling means or rope, so that it engages the rope-carrier at a point beneath the cable as distinguished from engaging it at a point above the cable. There was no invention, however, as it seems to me, in this. The idea, the means, the operation, and the result were all old. The Miller patent, No. 434,550, the North patent, and others, substantially show the same arrangement. In the claims of the Dusedau patent in which the propelling rope is characterized at all, it is called the "hauling-rope," but the art showed the hauling-rope and the fall-rope as frequently embodied in one and the same rope, and also showed the propelling rope, by whatever name called, applied to the rope-carrier below the cable. North uses both ropes to propel the mechanism of the rope-carrier. In his specifications he says:

"This fall-rope or endless rope [haul-rope], as the case may be, acts as a motor to drive the mechanism located upon each of the carriers," etc.

I find nothing of novelty or invention in what Dusedau did. Everything he did had been done before, or so clearly indicated as to be evident to any one skilled in the art. My conclusion, therefore, is that the Dusedau patent is invalid.

The question of infringement or noninfringement must depend mainly upon the question whether the complainant's device as claimed and shown necessarily requires two individual and separate wheels, a driving wheel and a driven wheel, as they have been termed, the sheave of the former coming in contact with the traveling rope, and that of the latter with the cable. If the complainant's device does require two such wheels, then it is claimed by the defendant that it does not infringe the patent in suit, because it uses but one wheel. Turning for a moment to the first claim of the North patent, we find as a part of the combination there claimed "a rope-carrier containing a wheel adapted to be turned by said traveling rope, a wheel adapted to bear against the cable or trackway and connections between said two wheels, whereby the rotation of the first is communicated to the second," but upon looking at the specifications, which may be done for the purpose of explaining, but not of contradicting the claim, it appears that the "connections between said two wheels" are so close and intimate that in one

place the wheels are said to be "fast to" and in another "fixed to" each other. By no casuistry can this language be made to mean other than that the wheels are fastened together, or fixed together, so that they revolve as one. The term "connections" is in nowise restricted, but, on the contrary, is broad and unlimited. It is, however strongly urged on behalf of the defendant that it uses no connections whatever, but that, instead thereof, the wheels of the North patent are in its device cast together as a single wheel, but with two peripheral contacts. It is true that it uses but one casting. I fail, however, to see that one casting forming a wheel, having two grooves side by side, differs in substance from two similarly grooved wheels bolted or clamped, or otherwise fastened together, so as to be operated as one. Whether it be called one wheel or called two wheels the difference is only in name, and not in substance. They are mechanical equivalents and might be used interchangeably in any desired combination.

As was said in Bundy Mfg. Co. v. Detroit Time Register Co., 94 Fed. 524, 538, 36 C. C. A. 375, one may not escape infringement by the mere joinder of two elements into one integral part. If the united part effects the same results in substantially the same way as the separate parts before the union, the change is colorable. See, also, Kalamazoo Ry. Supply Co. v. Duff Mfg. Co., 113 Fed. 264, 267, 51 C. C. A. 221; Dowagiac Mfg. Co. v. Superior Drill Co., 115 Fed. 886, 904, 53 C. C. A. 36; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co. et al., 118 Fed. 136, 141, 55 C. C. A. 86; Nathan v. Howard (C. C. A.) 143 Fed. 889, 893. The wheels of the rope-carriers of a cableway are of varying diameters, so that they move some faster and some slower as they follow the load-carrier, and evidently those which would have to travel the farthest would be given the highest speed. There have been offered in evidence, both on the part of the complainant and the defendant, drawings and models of the wheels, respectively, used by them in their rope-carriers. These wheels have been denominated as "¼ speed," "½ speed" and "¾ speed" wheels. The ¼ speed models of the respective parties are, it may fairly be said, duplicates. There is certainly no substantial difference between them, and I think the same is true of the ½ and ¾ speed wheels. The outward similarity between these is perhaps not so marked as it is in the case of the ¼ speed wheels, but the principle of the North patent, including its method of operation, and the result produced is there. The question whether the complainant's two wheels, so called, and the defendant's one accomplish the same result in substantially the same way, still remains the only vital one. In the case of the ½ speed carrier the North structure is shown as consisting of a wheel, with two grooves side by side, or, as the defendant chooses to say, with two grooved-wheels side by side, on which the main cable and the driving cable, respectively, bear; whereas the defendant used one groove in which the cables bear on opposite sides of the wheel, one above and one below, but North also discloses in some of his figures the main cable and the driving cable, bearing upon opposite sides of the wheel. Hence, since it has already been determined that the two wheels and the one wheel of the respective parties are equivalents, the question is narrowed to this: Does the mere fact that one of the parties uses two grooves and the other one

(the same cables bearing upon the respective wheels in substantially the same way to produce the same result) constitute any real difference? It seems to me that it does not, and that there is presented a mere modification of detail in construction. Both devices operate substantially alike to produce the same result. The utmost that can be said of the defendant's device is that it is an improvement upon North's. The invention which the North patent discloses ought not to be overthrown by what seems to me to be an obvious evasion. When we come to consider the ¾ speed wheels of the complainant and defendant, the unreality of any seeming difference between them is even more conspicuous. In this case the wheels upon which the cables bear are of widely different diameters. In the North patent the grooves are shown side by side, very much as they are in the ¼ speed wheel. In the defendant's structure, however, the larger wheel is split or divided in a central plane, and the smaller wheel is shown between the divided halves. This is in effect an extension of the outward flange forming one side of the groove of the smaller wheel of the North patent to the diameter of the larger wheel, or, putting it in a different way, if the defendant's wheels were sawed apart, so as to leave the entire small wheel attached to one of the divided halves of the large wheel, all that would be necessary to make them identical with the ¾ speed wheel of the North patent would be to deepen the grooves, and, if necessary for that purpose, have them cast a little thicker. One cannot study the different wheels of the complainant and defendant without being impressed with the fact that the same conception and function is common to both. The idea of evasion rather than of invention permeates the defendant's apparatus. It would seem as if their patentee, having absorbed the conception of North, was bent upon adopting it, and at the same time disguising it so as possibly to avoid infringement. This theory is all the more plausible since the inventor of the patents used by the defendant was a former employé of the complainant, and while so employed acquired knowledge of rope-carriers in general, and became especially familiar with the North patent, by studying the patent itself, and a model of it, as well as by seeing the apparatus in practical operation. My conclusion is that the defendant has infringed claims 1, 6, 7, 8, 9, and 10 of patent No. 480,029 in suit.

The defendant alleges, however, that the complainant's device is inoperative. On this point one of the defendant's experts goes little further than to say that it is inferior to the apparatus of the defendant, while another witness, the patentee of the defendant's devices, and interested financially in their success, naturally sees little or nothing to commend in the North patent. Under these circumstances, however, his testimony cannot be regarded as unbiased. But, as a matter of fact, it appears that the apparatus of the complainant has been used successfully in different places, although its manufacture and sale have never been pushed. The head of the complainant's cableway department testified in substance that after the North patent was acquired the complainant set up a model of it at its office, and that it was open to customers to order it or other rope-carriers as they chose; that at that time the complainant owned the Miller button rope-carrier patent which was in successful use; that the complainant gave its customers the

choice between the two systems; that, if they preferred the button rope-carrier, it was furnished; that, if the other system had been demanded, it would have been furnished; that when the North patent was issued they were selling cableways complete, with a button-stop fall-rope carrier; that their cableway had become a standard; and that they did not believe their customers would have been enough better pleased with the North carrier than with the button-stop system to warrant them in incurring an expense of thousands of dollars to make the changes necessary to put the former system on the market, although they always recognized its value and operativeness.

At all events, if my conclusions are correct, it seems to have been a sufficiently operative system for the defendant to adopt. The testimony discloses no satisfactory reason why the complainant should not be protected in its rights under the North patent.

A decree will be entered establishing the validity of claims Nos. 1, 6, 7, 8, 9, and 10 of patent No. 480,029, and that the same have been infringed by the defendant, and declaring that patent No. 548,973 is invalid. Costs will be allowed to the complainant.